Jack **ROSENFELD**, doing business as
**J. Rosenfeld Company**, Plaintiff-
Appellant,

v.

**LION MANUFACTURING CORPORA-
TION**, an Illinois corporation, et
al.[1], Defendants-Appellees.

No. 12084.

United States Court of Appeals
Seventh Circuit.

March 3, 1958.

Rehearing Denied April 9, 1958.

1. The other defendants are Bally Manu-
facturing Company, an Illinois corpora-
tion, Amusement Supply Company, Inc.,
an Illinois corporation, Raymond T.
Moloney, William O'Donnell, George W.
Jenkins, William C. Geiger, Phil Wein-
berg, Andrew J. Renn and Jack Nelson.

Henry J. Shames, Louis M. Mantynband, G. Gale Roberson, Irwin I. Zatz, Chicago, Ill., for appellant.

Benjamin M. Becker, Bernard Savin, Chicago, Ill., for Amusement Supply Co. and William C. Geiger.

Edward Rothbart, J. M. Rosenfield, Chicago, Ill., for Lion Mfg. Corp., Bally Mfg. Co., Raymond T. Moloney, William O'Donnell, George W. Jenkins, Phil Weinberg and Andrew J. Renn.

Before DUFFY, Chief Judge, and SCHNACKENBERG and HASTINGS, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Plaintiff's complaint, as amended, hereinafter referred to as the complaint (filed on April 12, 1954 and amended on April 15, 1954), consists of three counts.

Count I is based upon an alleged agreement entered into between plaintiff and defendant Bally Manufacturing Company, an Illinois corporation (hereinafter referred to as Bally), a copy of which is attached to the complaint and designated "Exhibit A". It is referred to in count I as an "agreement whereby plaintiff became exclusive regional distributor of the coin-operated amusement machines manufactured and sold by defendants Lion and Bally in the 'St. Louis-Southern Illinois territory'."

It is further alleged that defendant Lion Manufacturing Corporation (herein referred to as Lion) is engaged in the business of manufacturing and selling coin-operated amusement machines, that Bally is the alter ego of Lion, that Raymond T. Moloney is president of Lion and Bally, defendant Andrew J. Renn is executive vice-president and treasurer thereof, while defendant George W. Jenkins is vice-president of Bally. It is further alleged that defendant Jack Nelson [2] was general sales manager of Bally, defendant William O'Donnell is assistant sales manager of Bally and defendant Phil Weinberg is district sales manager of Bally.

Exhibit A we set forth below:

"July 20, 1945.
"Jack Rosenfeld,
 Rogers Park Hotel
 6807 N. Sheridan Road,
 Chicago, Ill.

"Dear Jack:

"Due to circumstances I am happy to depart from our established custom and give you this letter confirmation of our personal discussion and my verbal reassurance—that we are ready to appoint you our Bally Regional Sales Distributor for the 'St. Louis-Southern Illinois territory.'

"You, personally, know that it has never been our practice to execute formal written agreements or 'franchises' and be entirely satisfied with the same man-to-man understanding that we have with all our other key men who, thanks to their own qualifications and the Bally hook-up, are leaders in the industry.

"At the same time I appreciate that your Uncle, whom you expect to be associated with you, is not familiar with the background and it's no more than fair to give you this tangible support of the circumstances you have already reported to him.

"Turning to a few more specific details, we haven't as yet even exactly determined the full extent of the regional territory we will allot to you. As you and I arranged, part of that definition will depend upon the results of the survey you are conducting now and part on mutually agreeable lines we shall draw at our future convenience with others as Carl Hoelzel.

2. Defendant Jack Nelson died before the trial in the court below.

"Primarily, the 'St. Louis territory' would consist of the logical trade and promotion area of Eastern and Southern Missouri west to the limits we work out with Carl Hoelzel, Southern Illinois, roughly everything South of but including the tier of Counties from Adams (Quincy) and Schuyler on the West through and including Champaign and Vermillion on the West, plus such logical Western border Indiana Counties as your survey and our judgment will determine.

"Similarly, there may be a few Kentucky Counties bordering on Southern Illinois that logically fit into operating distributing allocations to the same area. This, again, for future determination made from your survey and our judgment.

"Since you and I understand and are in agreement upon the principles of promotion and sale which we both desire, there is no point in prolonging this letter with a recital of those principles as conditions necessary for your final appointment nor our final commitment. Those are clearly understood between us and it is mainly simply a matter of time and our continued health and well-being to put them into effect.

"I might add, however, that I believe that you should expedite your arrangements for your St. Louis headquarters, store, warehouse, etc., as I have a hunch we will need to start using that address and reference in a relatively short time now.

"Also, just to clear our own records—although you personally are the key reason for the decision which I have outlined here—I would appreciate your giving me a little personal reference and data on your Uncle whom you expect to be associated with you, simply so I can complete our own file information.

"With kindest personal regards.
Yours sincerely,
Bally Manufacturing Company
George W. Jenkins
Vice President and General Sales Manager."

It is further alleged that plaintiff is engaged in the business of buying, selling, maintaining and servicing, among other things, coin-operated amusement machines, including coin-operated amusement machines manufactured and sold by defendants Lion and Bally. Approximately 70% of the business of plaintiff is the sale of coin-operated machines manufactured and sold by defendants Lion and Bally.

The complaint further alleges: "Pursuant to the said exclusive regional distributorship agreement, plaintiff, as an exclusive regional distributor, was and is entitled to receive from Bally a commission of $30.00 upon the purchase of each and every machine of Lion and Bally by the plaintiff, said commission being payable to the plaintiff during the month following said purchase. This commission as exclusive regional distributor is in addition to the profits to which the plaintiff is entitled on all resales of said machines in said territory."

The complaint further charges that Moloney, Jenkins, Renn, Nelson, O'Donnell and Weinberg or some of them caused to be organized, as an Illinois corporation, defendant Amusement Supply Company, Inc. (hereinafter referred to as Amusement), of which defendant William C. Geiger was made president. The complaint also charges that defendants, in violation of the aforesaid agreement, "failed to perform" in certain particulars, wherefore plaintiff prays for an accounting for the amount of commissions and profits due him and that a decree be entered upon said accounting.

In count II of the complaint, plaintiff charges a common-law conspiracy between defendants Moloney, Renn, Jenkins, Nelson, O'Donnell, Weinberg, Amusement and Geiger to defeat plaintiff's rights "under his said contract with defendants Lion and Bally", as a direct consequence of which plaintiff was damaged; wherefore he demands judgment against said defendants.

In count III of the complaint plaintiff relies on § 2 of the Clayton Act, as

amended by the Robinson-Patman Act,[3] and §§ 4 and 14 of the Clayton Act,[4] and charges that Lion and Bally, in the course of commerce, sold coin-operated machines in violation of said act, wherefore he sues said defendants for treble damages sustained.

The gravamen of the causes of action set forth in counts I and II is the alleged agreement of July 20, 1945, known as Exhibit A. Defendants contend it is not a contract. This point was thoroughly argued before the district court and plaintiff stood upon this document asserting that it was a contract. In this respect he never amended his complaint after making Exhibit A a part thereof. He stood and still stands upon the complaint based upon said document.

 This writing is not a contract. In fact its language indicates that Bally was averse to executing written agreements or franchises and relied upon "man-to-man understanding" (whatever that means). In his brief, plaintiff admits that the complaint ineptly refers to the letter as evidencing an agreement. This being so, the burden was upon plaintiff to amend his complaint so as to set forth what he considered the agreement upon which he sues. Although this opportunity was afforded him in the district court, he did not amend. Therefore, in this situation, it is axiomatic that plaintiff cannot recover upon a cause of action different from that upon which his complaint is based. We are impressed by defendants' suggestion that plaintiff decided not to amend his complaint so as to set up a right of action growing out of a course of dealing, as distinguished from a written agreement, because he feared the defense of the statute of frauds. Such a defense would undoubtedly have been presented by defendants if plaintiff had amended his

complaint to rely, not upon Exhibit A, but upon an unwritten agreement established by the acts and statements of the parties over a long period of years. However that may be, plaintiff's counsel told the district court that plaintiff was relying on the contract set forth in count I and that "we have not varied our position".

Plaintiff, having mistakenly based count I upon an alleged agreement, which did not exist, the district court properly directed a verdict for defendants on count I.

Count II, having charged a conspiracy to defeat the rights of plaintiff "under the said contract" (Exhibit A), fails because of our holding that that writing did not constitute a contract. Hence the direction of a verdict for defendants on count II was proper.

In count III of the complaint, plaintiff sues under § 4 of the Clayton Act,[5] to recover treble damages for alleged violations of § 2 of that act, as amended by § 1(a) of the Robinson-Patman Act.[6]

Plaintiff's contentions are: During the period August 1953 to April 12, 1954, Lion and Bally sold games to Amusement at lower prices than identical games were sold to plaintiff, in interstate commerce. Both plaintiff and Amusement resold such games in the same market. Amusement received such lower prices because it received a regional commission or discount of $30 upon each game purchased by it as well as upon each game purchased by plaintiff. The average discrimination per unit was $52.50.[7]

On the other hand, defendants assert that, under the act relied on by plaintiff, the first element of proof required to establish a cause of action is to show a discrimination in price. They say that

3. 15 U.S.C.A. § 13.

4. 15 U.S.C.A. §§ 15 and 24.

5. 15 U.S.C.A. § 15.

6. 15 U.S.C.A. § 13.

7. If the practices of which plaintiff complains constitute a violation of § 2 of the Clayton Act, as amended, "they are actionable by one injured thereby solely under that Act". Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 78 S.Ct. 352, 357, 2 L.Ed. 2d 340.

there is no such discrimination shown on this record and that the facts as to that issue are not in dispute. They point out that the games involved in this case were sold to Amusement at a price of $540 each and that, if a sale was made to other than defendants' distributor, at a price in excess of $540, as it usually was, such excess was credited to the distributor as an "override". Prior to August 1953 these overrides were credited to plaintiff and thereafter to Amusement. They contend that crediting an override on such shipments did not give rise to a cause of action under the act. Defendants argue that this "regional distributor setup was employed by Lion, in common with a great many manufacturers, as a method of distributing its merchandise nationally. * * * If this method were not employed, Lion would itself have to open offices in the various regions of the country for the purpose of providing facilities locally for the distribution of its merchandise. The regional distributor performs various functions; he has a place of business where merchandise is displayed; he deals with the customers in the area, handles matters of credit, etc., deals with traded-in equipment, and things of that nature. Such functions and services are of value and compensation is paid. * * * The mere fact that the method of compensation was based upon the number of units shipped into the territory does not make that any the less compensation and does not transform it into a price allowance or a reduction in price on merchandise bought. One has nothing to do with the other."

Therefore, defendants submit that the first necessary element of the cause of action—a discrimination *in price*—is lacking, that that is the only concern of the act, and that it has nothing to do with commissions paid for services rendered.

To meet these contentions, plaintiff asserts that Lion and Bally have in fact only one class of customers—regional distributors, that the claimed classification as between plaintiff and Amusement is arbitrary and is not based upon actual economic functions performed by the parties involved. He says the Robinson-Patman Act deals with economic realities, not with fictions.

Plaintiff argues that discounts given Amusement were not even purportedly compensation; they were keyed to specific purchases identified by invoice numbers and dates, including the purchases made by plaintiff and they bear no relationship to the cost of servicing the account, and, therefore, that in this record there is no support for last-ditch fictional classifications which do not follow functional lines.

Plaintiff contends that whether defendants' allowance of a discount to Amusement was payment or compensation for services rendered by it, was a question of fact for the jury.

The law is well-established that it is the function of a jury to draw inferences or conclusions from the evidence and that a trial court cannot properly direct a verdict, where the evidence is not so conclusive that all reasonable men in the exercise of an honest judgment can draw but one inference or conclusion therefrom, but is such that fair-minded and intelligent men, acting reasonably, can reach different conclusions as to the inferences, deductions, or conclusions therefrom. 88 C.J.S. Trial § 259, p. 708.

In Stanek v. Cole, 7 Cir., 178 F.2d 122, 125, we said:

"The rule is well established that * * * where reasonable minds might draw *different inferences* from the credible evidence or the admitted facts, it is for the jury to determine which witnesses to believe and *which inferences to draw*. Under such circumstances the court should not assume to direct a verdict * * *." (Emphasis supplied.)

In Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L. Ed. 520, the court said:

" * * * It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among *conflicting inferences* and conclusions that which it considers most reasonable. Washington & Georgetown R. Co. v. McDade, 135 U.S. 554, 571, 572, 10 S. Ct. 1044, 1049, 34 L.Ed. 235; Tiller v. Atlantic Coast Line R. Co., supra, 318 U.S. [54], 68, 63 S.Ct. [444], 451, 143 A.L.R. 967; Bailey v. Central Vermont Ry., 319 U.S. 350, 353, 354, 63 S.Ct. 1062, 1064, 87 L.Ed. 1444. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn *different inferences* or conclusions or because judges feel that other results are more reasonable." (Emphasis supplied.)

It was the function of the jury to draw an inference from the evidence as to whether the acts of defendants constituted a method of compensating Amusement or a method of price discrimination.[8] It was, therefore, error for the district court to direct a verdict for defendants on count III of the complaint, as amended.

For the reasons herein stated, the judgment of the district court on counts I and II of the complaint, as amended, is affirmed and its judgment on count III thereof is reversed and this cause is remanded to the district court for a new trial on count III.

Affirmed in part and reversed and remanded in part.

8. See F. T. C. v. Ruberoid Co., 343 U.S. 470, 475, 72 S.Ct. 800, 96 L.Ed. 1081.